## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 19 B 4105 |
| ERIC M. UDELHOVEN, | ) | |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| GRANT MANNY and KATHARINE LENNOX, | ) | |
| | ) | Adv. No. 19 A 918 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge David D. Cleary |
| ERIC M. UDELHOVEN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the court following a two-day trial on the complaint filed by Grant Manny ("Manny") and Katharine Lennox ("Lennox") (collectively, "Plaintiffs") against Eric Udelhoven ("Udelhoven" or "Defendant"). Plaintiffs seek a finding that the debt they claim Defendant owes them is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2), (a)(4) and (a)(6). They also seek denial of Udelhoven's discharge under 11 U.S.C. §§ 727(a)(3) and (a)(4). Having heard the testimony of witnesses, reviewed the exhibits admitted into evidence, and read the briefs submitted by the parties, the court will enter judgment on all counts in favor of Defendant Eric Udelhoven.

# I.    JURISDICTION

The court has subject matter jurisdiction under 28 U.S.C. § 1334(b) and the district

court's Internal Operating Procedure 15(a). This is a core proceeding under 28 U.S.C. §§

157(b)(2)(I) and (J). Venue is proper under 28 U.S.C. § 1409(a).

# II.    FINDINGS OF FACT

In June or July of 2018, Grant Manny and his wife Katharine Lennox put the property

located at 1413 West Belle Plaine Avenue, Chicago ("1413 Belle") under contract. (Tr. Vol. I, p.

12). Around the same time, Manny reached out to Eric Udelhoven for a meeting about the

construction project that he and Lennox contemplated for their new home. (*Id.*).

**Eric Udelhoven and Catalyst Construction**

Udelhoven has a degree in construction management and formed Catalyst Construction in

2008. He was Catalyst's sole member until it filed for relief under the Bankruptcy Code. (*Id.*, p.

77; Case No. 19 B 4101, EOD 1).

Nearly all of Catalyst's projects were rehab and renovation work. Udelhoven hired

various types of employees including carpenters, apprentices, drivers, superintendents, project

managers and general managers. (Tr. Vol. I, pp. 78, 85-86). He directly supervised the general

manager and did most of Catalyst's sales and marketing work. (*Id.*, pp. 78-79).

During the year prior to Catalyst's bankruptcy filing, at least eight managers worked

there. This included general manager Mark Elachowicz, whom Udelhoven hired in October

2018. (*Id.*, pp. 80, 83-84). Udelhoven relied heavily on Elachowicz "to manage the payments

that were going out to vendors." (Plaintiff Ex. M, p. 47, lines 9-10).

Udelhoven did not approve all decisions at Catalyst. "I didn't manage that way. I

empowered my managers and employees to make decisions for themselves." (Tr. Vol. 1, p. 86,

lines 13-15).  The project managers "were responsible for managing the profitability and

execution for their projects after we got it into the project system....  [I]f there was an issue... I

would talk with the people that would be involved and we'd do what we needed to do to push

things forward."  (*Id.*, p. 87, lines 8-10, 13-16).

A third party handled Catalyst's payroll.  Udelhoven, the general managers and an office

manager could sign checks for the company.  (*Id.*, pp. 79-80, 88).  Udelhoven used QuickBooks

to reconcile Catalyst's financial records.  (*Id.*, pp. 80-82).  He also used QuickBooks to produce

a spreadsheet, the purpose of which was to see how much money was coming in and going out of

Catalyst "so we could make sure that we were getting things paid in a timely manner."  (*Id.*, p.

82, lines 21-23).

When asked at trial if he could track what was spent on the project at 1413 Belle,

Udelhoven responded:

> It could be done, but it would be – I mean, we could go back through QuickBooks
> and do a project accounting via QuickBooks if we really needed to.
>
> But, you know, I would probably need to get – it's all recorded in Quickbooks, all
> of it was or should have.  That's – how we file our taxes is, you know, everything
> goes into QuickBooks so we know what expense is what.

(*Id.*, p. 112, lines 16-24).

In his deposition, Udelhoven admitted that "[a]s far as like dollar for dollar, there was not

really a way to track it dollar for dollar."  (Plaintiff Ex. M, p. 70, lines 21-23).  But if Catalyst

had not been going through a migration from Quickbooks to the cloud-based platform

Buildertrend, "it potentially could have been done . . . because we did job cost projects after we

finished."  (Tr. Vol. I, p. 114, lines 21-23).

When challenged as to whether he could tell which checks were for which projects at

Catalyst, Udelhoven stated that although it would take "an exorbitant amount of time to do it at

this point because it was fragmented. . .  if I needed to go back through and do a project

accounting for this, it could be done."  (*Id.*, p. 115, lines 18-19 and 21-22).

Catalyst had one primary bank account with two debit cards ending in 6154 and 4627.

(*Id.*, pp. 92-93).  During the trial, Plaintiffs' counsel reviewed various charges on those cards.

(Plaintiff Ex. G-1).

| Page | Date | Charge | Amount | Udelhoven's explanation (Tr. Vol. I) |
|---|---|---|---|---|
| 15 | June 21 | Microsoft Xbox Game | $10.89 | "[W]e did have an Xbox at the office.  I mean, I wanted to have a fun working environment."  (p. 121, lines 1-2). |
| 16 | June 25 | Main Street Liquor | $28.23<br><br>$68.66 | "[W]e kept a refrigerator stocked with beer."  (p. 121, lines 7-8). |
| 17 | June 27 | Itunes | $0.99 | "We had a TV at the office.  You know. . . I was at one point working 12-hour days . . . so sometimes in the middle of the day it would be nice to chill out." (p. 121, lines 13-16). |
| 17 | June 28 | Netflix | $15.25 | |
| 25 | July 16 | Great Wolf Lodge | $530.68<br><br>$50 | "I don't know exactly what that was.  I used to travel a lot because we were Kohler's preferred installer in all of Chicago.  But I think this was a comp to a client for some reason." (p. 122, lines 1-5). |
| 25 | July 16 | Citgo (Wisconsin Dells) | $56.32<br><br>$24.63 | "I used to go to Wisconsin all the time for business just because of my relationship with Kohler…. [U]nfortunately by the time we went bankrupt, we were working on a beta program with Kohler to accomplish more in the e-commerce space.  So I was up there quite often." (p. 122, lines 14-16, 18-21). |
| 27 | July 25 | 1-800-Flowers | $102.49 | "[W]e finished a number of projects every month.  And, you know, if the project went really well, people were |

| | | | | |
|---|---|---|---|---|
| | | | | super happy or something, we would do, you know, for the customers, you know, a bottle of wine, get them a bouquet of flowers, you know, just something nice." (p. 123, lines 2-7). |
| 38 | Aug 14 | Floyd's 99 Barbershop | $26.00 | "I would consider it a business expense because my appearance was the face of the business."  (p. 123, lines 17-18). |
| 61-62 | Oct 12 | Restaurants and hostel in Wrigleyville | | "I took a client to a concert" and stayed overnight. (p. 124, line 6). |
| 66 | Oct 26 | Green Paws Veterinary | $120.40 | "I don't remember what it would be for, but, you know, I wouldn't have run it through the business account if it wasn't a verifiable business expense."  (p. 124, lines 12-15). |
| 84 | Dec 14 | Mario Tricoci | $145 | "gifts for customers" (p. 124, lines 20-21). |
| 86 | Dec 24 | Atlas Obscura | $190.66 | "[I]t was an event that I went to in January. . .  It was a networking opportunity." (p. 125, lines 3 and 5). |
| 94 | Jan 17 | Lakeview Smoke & Vape | $12.90 | "I don't know.  I don't vape.  So, I probably bought Gatorade at a convenience store or something for the guys."  (p. 125, lines 9-11). |

**Starting the project at 1413 Belle**

Manny is an asset manager for a commercial real estate firm and has worked in the real

estate business for the last ten years.  (Tr. Vol. 1, p. 9).  He and Lennox interviewed seven or

eight contractors for the renovation of 1413 Belle and eventually hired Udelhoven.  (*Id.*, pp. 12-

13).  Udelhoven expected to complete the project according to the contract.  "The company had

tremendous momentum in the summer of '18, even going into the winter that year.  It was

actually a pretty good year."  (*Id.*, p. 130, lines 6-9).

At their second meeting, Manny and Udelhoven "discussed the timeline we needed based on having a new baby in November of 2018, and the fact that we were going to be on a short-term lease for that period of time.  And so part of the reason for discussion of the short-term lease was for the timeline that Eric had presented."  (*Id.*, p. 14, lines 10-15.)  Udelhoven told Manny that he and Lennox would be able to move into 1413 Belle "probably sometime in April of '19."  (*Id.*, lines 19-20).

Manny and Lennox's short-term lease was set to expire in May 2019.  (*Id.*, p. 17).  "[I]t was close by so, you know, we would have enough time to both finish the project and get into the new house based on the timeline Eric provided."  (*Id.*, lines 13-16).

Udelhoven created and provided a contract, which Manny marked up and revised.  (*Id.*, pp. 14-15).  In his line of work, Manny has reviewed "around a hundred" construction contracts.  (*Id.*, p. 10).  He and Udelhoven went back and forth two or three times with adjustments.  (*Id.* at 15).  Plaintiffs eventually signed the contract on July 23, 2018.  (Plaintiff Ex. B).

The contract did not include a completion date.  (Tr. Vol. I, p. 63; Plaintiff Ex. B).  Manny believed that Udelhoven committed to finishing by a date certain: "My definition of committal, he shook my hand and told me that he would get it done by April, and that – he told me that several times throughout the project."  (Tr. Vol. I, p. 64, lines 8-11).  Manny acknowledged, however, that Udelhoven told him "until demo was complete, we wouldn't have a real deadline.  So, it was more of a – as long as there were no problems, we think we can get it done by this time."  (Def. Ex. 9, p. 8, lines 6-9; Tr. Vol. I, p. 66).  Udelhoven concurred that "there was a target date, but nothing was ever included contractually. There was no performance clause."  (Tr. Vol. I, p. 98, lines 8-10).

Manny and Lennox made an initial payment of 20% at signing.  (Plaintiff Ex. D).

Several stages of work were described in the contract, and each of the stages required a payment

at the start.  (Tr. Vol. I, pp. 18-19; Plaintiff Ex. B).

> Payment will be made as follows:  20% upon signing . . ., 10% upon start of
> demolition, 10% upon start of framing, 10% at start of HVAC, 10% at start of
> plumbing or electrical, 10% at start of flooring, 10% at start of drywall, 5% at
> start of trim, 10% upon substantial completion and 5% upon final completion.

(Plaintiff Ex. B).  Manny and Lennox eventually made four of these payments: the 20% deposit

upon signing, 10% for the start of demolition, 10% for the start of framing and 10% for the start

of electrical. (Tr. Vol. I, p. 103; Plaintiff Ex. D).

In Manny's experience, this sort of payment schedule was not usual practice. (Tr. Vol. I,

p. 19).  He discussed this with Udelhoven, who "explained that based on the timeline and the fact

that, you know, dealing in residential, with residential subcontractors, that was the reason to have

a deposit, both to maintain the timeline and to get priority with those subcontractors. . . .  [T]hose

subcontractors don't have the cash flow that a professional operation would to, you know, give

them the ability to start the project." (*Id.*, p. 20, lines 6-10 and 14-16).  Meanwhile, Catalyst's

cash flow was "on average a hundred to $200,000 every month." (*Id.*, p. 128, lines 24-25).

In commercial and residential projects when a lender is involved, payments are usually

made through a title company. (*Id.*, pp. 73-74, 100).  But if no lender was involved, Udelhoven

always structured his contracts with payments due at the start of different phases. (*Id.*, p. 100).

**Manny and Lennox order finished goods for the project**

At the beginning of the project, Udelhoven was Manny's primary contact at Catalyst.

(*Id.*, p. 23).  This eventually changed to project manager Mike Eviston and designer Amy

Wettersten. (*Id.*).  Manny and Lennox met with Wettersten and visited third-party vendors to

choose finished goods such as plumbing fixtures, cabinets, countertops and tiling.  (*Id.*, pp. 31-32).

Once they chose these items, Manny and Lennox paid Catalyst half of the total cost as a deposit.  (*Id.*, pp. 32-33; Plaintiff Ex. D).  The final installment on the finished goods and trim was paid on December 3, 2018.  (Tr. Vol. I, p. 34; Plaintiff Ex. D).

Udelhoven told Manny and Lennox that he needed the money to pay the vendors, otherwise they would not deliver the goods.  (Tr. Vol. I, p. 35, pp. 72-73).  Udelhoven was not involved in ordering finished goods; he relied on Elachowicz to get that done and to let him know when the goods were ready.  (*Id.*, p. 132-35).  According to project manager Eviston, any kind of purchase for the 1413 Belle project had to go through Udelhoven or one of the office managers.  (Tr. Vol. II, p. 9).

Udelhoven believed that the finished goods Manny and Lennox selected had been ordered from the vendors.

> The trigger for the second payment is actually when I received an email from my general manager saying that the cabinets were in at the cabinet supplier.  And…. all that plumbing product was on order from the supplier…. [A]s far as personally checking on it, you know, that wasn't – that wasn't what I was doing at that point….  I did not know if it was paid for, no.

(Tr. Vol. I, p. 111, lines 7-11, 15-19, 23).  Udelhoven also recalled that while Manny and Lennox had selected certain items from Studio 41, "Mark had done research and actually found a better price at a different distributor."  (*Id.*, p. 111, lines 13-15).

Manny and Lennox never received any of the finished goods for which they paid Catalyst.  They had to purchase all the finished goods again to complete construction.  (*Id.*, pp. 38-39, 57-58).

Manny and Lennox also purchased some flooring, fixtures, windows and doors on their own.  (*Id.*, p. 22, 33-34).  Some of those items were kept at 1413 Belle, others at the

8

condominium they were renting.  (*Id.*, p. 37).  The items kept at 1413 Belle were removed, but

Manny and Lennox were eventually able to recover them.  (*Id.*, p. 71).

**Making progress in the fall of 2018**

Manny visited the construction site frequently; it seemed to him that progress was

"moving along" in late August and early September.  (*Id.*, p. 24, line 13).

Manny and Lennox made another payment to Catalyst on September 6, 2018, for

architectural and engineering drawings.  (*Id.*, p. 26; Plaintiff Ex. D).  This was a change order; it

was not part of the original contract.  Manny explained that "there were various change orders

due to issues we found after demolition."  (Tr. Vol. I, p. 27, lines 6-7).

On September 24, 2018, Manny wrote another check to Catalyst for the start of electrical

work.  (*Id.*, p. 27; Plaintiff Ex. D).  Manny believed that "nothing can really start until demolition

is complete."  (Tr. Vol. I, p. 21, lines 4-5).  Udelhoven did not agree that each phase of work

would have to be complete before starting the next phase.  "[I]t's typical for – you know, as

you're moving through doing demolition to follow through framing behind that.  I mean, it's not

just a binary way."  (*Id.*, p. 99, lines 21-24).

Udelhoven and Manny met at 1413 Belle around October 1, 2018.  (*Id.*, p. 28).

Udelhoven explained that additional structural support – trusses, also known as LVLs – would be

needed for the open plan layout.  Manny recalled that Udelhoven stated "that he was still on

track and able to meet that timeline, even with the LVLs."  (*Id.*, lines 16-17).

Manny and Lennox's next payment to Catalyst was made on October 8, 2018.  (Plaintiff

Ex. D).  The memo line on the check states "10 percent start of framing, LVL installation."  (*Id.*).

Manny noticed that the work had slowed down, and later in October he spoke to Udelhoven

about his concerns. (Tr. Vol. I, pp. 29-30).  They also discussed the back framing of the house as

well as the front stairs.  Udelhoven assured Manny that the project should finish by the end of

April, although there was still no formal schedule. (*Id.*, p. 30).

After a change order was issued at the end of October on the design of the interior front

stairs and the exterior back porch stairs, Manny and Lennox made another payment.  (*Id.*, pp. 30-

31; Plaintiffs Ex. I).  This check, dated October 28, 2018, was in the amount of $8,925.

(Plaintiffs Ex. D).

**Work slows at 1413 Belle; an architect is hired, and a decision is made to pull permits**

By early December, Manny noticed that Eviston was becoming difficult to reach, and "it

appeared that no work was being done."  (Tr. Vol. I, p. 40, lines 10-11).  Udelhoven assured

Manny that he would bring in another project manager and get 1413 Belle back on track.  (*Id.*, p.

40).  He still intended to finish the work on 1413 Belle as provided in the contract, with some

delay due to the change orders.  (*Id.*, pp. 130-31).

Around this time, Manny learned that the LVLs were not "within the threshold as

identified on the structural plans . . . meaning that they had to be changed because they weren't

going to provide the structural support that was necessary."  (*Id.*, p. 44, lines 5-6 and 8-10).

Project manager Eviston stopped working at 1413 Belle, uncomfortable about fixing

these structural issues without architectural drawings.  (Tr. Vol. II, p. 11).  When he left, Eviston

thought demolition was about 80% complete, including demolition of electrical and plumbing,

and framing about 30% complete.  (*Id.*, p. 12-13).  Udelhoven brought in a new project manager

named Rob Berg.  (Tr. Vol. I, p. 44).

Manny and Lennox hired Widler Architects in November or December 2018.  (*Id.*, p. 69).

The architect "provided a structural engineering report on trusses and for the rear porch area, as

well as a layout plan for the property."  (*Id.*, p. 25, lines 19-21).

Manny spoke with Udelhoven at this time and again in January, expressing his dissatisfaction with the progress.  (*Id.* at 45).  Manny and Lennox decided to extend their short-term lease, and Udelhoven agreed to pay any additional living expenses based on his delays. (*Id.*, pp. 45-46).

On January 9, 2019,[1] Manny met with Berg, the new project manager.  Although Manny originally thought the project could be completed without permits, he came to believe that with the amount and type of work being done, permits were necessary.  (*Id.*, pp. 46-47).

The next day, Manny met with the architect to discuss the LVLs and the need for permits. (*Id.*, p. 48).  Manny expected a change to the scope and direction of the project based on hiring an architect to do a more comprehensive plan.  (*Id.*, pp. 48-49).  Another Catalyst carpenter, Scott Cetner, had recommended pulling permits, although "no one wanted to pull permits on the job."  (Tr. Vol. II, p. 21, lines 18-19).

Manny met with Udelhoven and Berg on January 22, 2019.  (Tr. Vol. I, p. 117).  They discussed a revised schedule and a revised contract, with a penalty for work continuing beyond a certain date, but no documents were ever exchanged.  (*Id.*, p. 53).  The new completion date under discussion was August 2019.  (*Id.*, p. 70).

**Catalyst leaves 1413 Belle**

Catalyst began removing the LVLs.  However, despite the discussions on January 22, Catalyst left the job site before all were removed, and never installed any new LVLs.  (*Id.*, p. 54). At some point in early February 2019, Catalyst removed a temporary heater that was keeping the house warm.  (Joint Pretrial Statement, Stipulated Fact #36).  Manny felt "the property was left

---

[1] The transcript states that the meeting took place on June 9th.

sort of in an abandoned state with no heat." (*Id.*, p. 55, lines 17-19). Udelhoven did not know

who directed the employees to stop working and to remove the heater. (*Id.*, p. 118).

Udelhoven thought that the demolition at 1413 Belle was nearly complete. "[W]hen I

was there in late January, the place was literally stripped down to the studs. So, you know, the

place had been demoed and all of the debris, at least from me looking at it, had been removed

from the residence." (*Id.*, p. 131, lines 21-25). Some framing had been done. (*Id.*, p. 131).

"[Y]ou know, there were a number of people that got paid to do the framing work and the LVL

work on the site." (*Id.*, p. 108, lines 22-24).

At this time, Manny realized that none of the finished goods had been ordered. (*Id.*, p.

57). By mid-February, Manny and Lennox had hired a new contractor, Mike B Construction.

(*Id.*, p. 58). Manny characterized the scope of the work to be done by Mike B Construction

"basically as everything that we had contracted with Eric [Udelhoven] to do." (*Id.*, p. 59, lines 2-

3).

Mike B did more demolition work and president Mihai Pop testified that neither the

framing nor the electrical work had started. (Tr. Vol. II, pp. 27-28). He elaborated: "[W]as a lot

of structure done, but it completely wrong, so we had to take it apart again, demo everything and

redo it completely." (*Id.*, p. 28, lines 8-11).

**Catalyst and Udelhoven file for relief under the Bankruptcy Code**

After finding January 2019 to be "particularly challenging," Catalyst and Udelhoven each

filed for relief under Chapter 7 on February 15, 2019. (Tr. Vol. I, p. 118, 119 line 15).

Manny and Lennox were not listed with the unsecured creditors on Catalyst's Schedule F.

Manny was included on Schedule G with 19 other "construction contact" parties. (Plaintiff Ex.

C). Udelhoven explained, "I think what we did was the contracts that had been started but not

12

completed were listed as executory contracts on the Catalyst filings and not my personal…. But the ones that had paid a deposit and had not started versus the ones that were started with progress…. I know that there was a distinction that we made at the onset." (Tr. Vol. I, p. 136, lines 2-5, 7-11).

On March 22, 2019, Udelhoven filed amended schedules. The amended Schedule F added several construction contract parties, including Manny. (Case No. 19 B 4105, EOD 18). This was approximately four days before his § 341 meeting of creditors. (*Id.*, EOD 7).

Udelhoven provided several documents to the Catalyst case trustee as well as to Manny and Lennox. (*Id.*, p. 139). These include approximately 200 pages of Catalyst's 2017-2019 ledger for its account at BMO Harris. (Defendant Ex. 12).

Catalyst had borrowed from several different lenders. Kabbage is listed on Catalyst's Schedule F at line 3.24, with a claim in the amount of $20,679, and Legend Advance Funding at line 3.26, with a claim in the amount of $121,280. (Plaintiff Ex. H). Catalyst borrowed these funds in late 2018. (Tr. Vol. I, p. 128). Udelhoven explained, "[t]hat was pretty typical, though, going into winter." (*Id.*, p. 128, lines 19-20). Otherwise, Catalyst had "had almost a record year with new business and doing quite well with projects closing out." (*Id.*, p. 127, lines 22-24). Catalyst also borrowed from SomerCor and FC Marketplace, LLC in the first half of 2016 (Case No. 19 B 4101, Claims Register Nos. 15-1 and 9-1).

Manny and Lennox moved into 1413 Belle on December 24, 2019. (Tr. Vol. I, p. 62).

### III.    CONCLUSIONS OF LAW

Plaintiffs ask the court to find that their claim against Udelhoven is nondischargeable, and that Udelhoven's discharge should be denied. Before the court can consider these issues,

however, it must resolve the threshold question of whether Udelhoven is liable to Manny and Lennox at all.

Manny and Lennox signed a contract with Catalyst. There is no question that Catalyst breached that contract, but Manny and Lennox have a claim against Udelhoven only if they can pierce the corporate veil and hold Udelhoven liable for Catalyst's debts.

### A. The Corporate Veil Between Catalyst and Udelhoven Should Not Be Pierced, so Manny and Lennox Have a Claim Only Against Catalyst

Corporations and limited liability companies are separate and distinct legal entities from their shareholders and from each other. Shareholders and officers are usually not liable for the corporation's debts, even when a corporation has a single shareholder. *See In re Estate of Wallen*, 633 N.E.2d 1350, 1357 (Ill. App. Ct. 1994). Illinois courts acknowledge that "the primary purpose of corporations is to insulate stockholders from unlimited liability." *Buckley v. Abuzir*, 8 N.E.3d 1166, 1170 (Ill. App. Ct. 2014).

> However, a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity. This doctrine fastens liability on the individual or entity that uses a corporation merely as an instrumentality to conduct that person's or entity's business. Such liability arises from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation. The doctrine of piercing the corporate veil is an equitable remedy; it is not itself a cause of action but rather is a means of imposing liability on an underlying cause of action, such as a tort or breach of contract.

*Peetoom v. Swanson*, 778 N.E.2d 291, 294-95 (Ill. App. Ct. 2002) (citations omitted).

"Piercing the corporate veil is not favored and in general, courts are reluctant to do so." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) (citations omitted). *See Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co., Inc.*, 826 F.2d 725, 728 (7th Cir. 1987) ("Under Illinois law, separate corporate existence is the rule to which piercing the corporate veil is a stringently applied exception.") (footnote and citations

14

omitted).  Reluctance to pierce the corporate veil is especially appropriate in breach of contract

cases (as opposed to tort cases), "because the party seeking relief in a contract case is presumed

to have voluntarily and knowingly entered into an agreement with a corporate entity, and is

expected to suffer the consequences of the limited liability associated with the corporate business

form." *Willow Elec. Supply Co., Inc. v. Fleites*, 2020 WL 2231869, *17 (Ill. App. Ct. May 7,

2020) (quotation omitted), *appeal denied*, 154 N.E.2d 784 (Ill. 2020).

To pierce the corporate veil, "[t]he plaintiff must demonstrate that: (1) there is such a

unity of interest and ownership that the separate personalities of the corporation and the parties

who compose it no longer exist, and (2) circumstances are such that adherence to the fiction of a

separate corporation would promote injustice or inequitable circumstances." *A.L. Dougherty

Real Estate Management Co., LLC v. Su Chin Tsai*, 98 N.E.3d 504, 515 (Ill. App. Ct. 2017)

(quotation omitted).  *See Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1345

(7th Cir. 1987).

In other words, Manny and Lennox must prove that Catalyst was so controlled and its

affairs so conducted that it was a mere instrumentality of Udelhoven (the "unity of interest and

ownership" prong), and that observance of the fiction of separate existence would, under the

circumstances, sanction a fraud or promote injustice (the "fraud" prong).

> In determining whether the "unity of interest and ownership" prong of the
> piercing-the-corporate-veil test is met, a court generally will not rest its decision
> on a single factor, but will examine many factors, including: (1) inadequate
> capitalization; (2) failure to issue stock; (3) failure to observe corporate
> formalities; (4) nonpayment of dividends; (5) insolvency of the debtor
> corporation; (6) nonfunctioning of the other officers or directors; (7) absence of
> corporate records; (8) commingling of funds; (9) diversion of assets from the
> corporation by or to a stockholder or other person or entity to the detriment of
> creditors; (10) failure to maintain arm's-length relationships among related
> entities; and (11) whether, in fact, the corporation is a mere facade for the
> operation of the dominant stockholders.

*Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 778 (Ill. App. Ct. 2005) (citations omitted).

Manny and Lennox argue that four of these factors are present: (1) Catalyst lacked corporate records; (2) Udelhoven and Catalyst commingled funds; (3) Catalyst was inadequately capitalized; and (4) Udelhoven treated Catalyst's assets as if they were his own.  Since Plaintiffs' brief mentions only these four factors out of the eleven that may be considered by the court, the court infers that, to the extent any of the other factors would apply to this limited liability company, there is no evidence any of them would support piercing the corporate veil.

### 1.  Catalyst was not a mere instrumentality of Udelhoven

#### a.  Catalyst's corporate records were not absent

Manny and Lennox note that Udelhoven testified he did not know what materials Catalyst purchased and paid for on the project at 1413 Belle.  They also argue that Udelhoven was not capable of tracing any of the checks, purchases or expenses to 1413 Belle. (Plaintiffs' Posttrial Brief, p. 7).

This argument does not accurately reflect Udelhoven's testimony.  When asked at trial if he had any way of tracking dollar for dollar what was purchased for the project at 1413 Belle, Udelhoven replied:

> It could be done, but it would be – I mean, we could go back through QuickBooks and do a project accounting via QuickBooks if we really needed to.

> But, you know, I would probably need to get – it's all recorded in Quickbooks, all of it was or should have.  That's – how we file our taxes is, you know, everything goes into QuickBooks so we know what expense is what.

Manny and Lennox point to Udelhoven's deposition testimony, where he stated that purchases were not being tied to jobs after Eviston took over.  "As far as like dollar for dollar, there was not really a way to track it dollar for dollar."  But Udelhoven clarified at trial that he could have done it if Catalyst had not been going through a migration to Buildertrend "because we did job cost projects after we finished."  When challenged as to whether he could tell which

checks were for which projects, Udelhoven testified that although it would take "an exorbitant amount of time to do it at this point because it was fragmented. . .  if I needed to go back through and do a project accounting for this, it could be done."

Moreover, whether or not the record keeping for this single project was done properly, and whether or not Catalyst could have reconstructed the spending on 1413 Belle if it were requested, the veil-piercing test asks whether Catalyst maintained corporate records in general. In fact, it did.

The company kept accounting records on QuickBooks and transitioned to the cloud-based platform Buildertrend in the fall of 2018.  Those records are available; Udelhoven reconciled them at the case trustee's request.  Since Plaintiffs did not admit the records into evidence, the court infers that they would support a finding that Catalyst did keep adequate records.

Plaintiffs adduced no testimony regarding minutes, resolutions, or other types of corporate records.  Since it is Plaintiffs' burden of proof to demonstrate that the corporate veil should be pierced, the court infers that there is no issue with other types of corporate records.

Finally, Catalyst is a limited liability company and not a corporation.  Some of the factors used to pierce a corporation's veil do not apply to limited liability companies.  One of those inapplicable factors is lack of records.  *See* 805 ILCS 180/10-10(c) ("The failure of a limited liability company to observe the usual company formalities or requirements relating to the exercise of its company powers or management of its business is not a ground for imposing personal liability on the members or managers for liabilities of the company."); *In re Thornton*, 615 B.R. 824, 831 (Bankr. C.D. Ill. 2020) ("Because of the statutory protections for members and managers of limited liability companies. . . lack of records . . . would not apply here.").

### b. Catalyst was undercapitalized

In considering whether Catalyst was undercapitalized, the court "compares the amount of capital to the amount of business to be conducted and obligations to be fulfilled." *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 752 (7th Cir. 2012) (quotation omitted). In other words, the court must ask whether Catalyst had enough "equity capital [which is] the excess of total assets over total liabilities." *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 612 (7th Cir. 2009).

Manny and Lennox contend that Catalyst was vastly undercapitalized. (Plaintiffs' Posttrial Brief, p. 8). Plaintiffs provide no information in their posttrial brief regarding Catalyst's liabilities, so it is difficult to tell at first glance whether they present a valid argument. Reviewing Catalyst's schedules, however, shows that like most entities that file for Chapter 7, Catalyst's liabilities far exceeded its assets. Catalyst was undercapitalized at the time it filed for relief under the Bankruptcy Code.

On the other hand, Plaintiffs submitted no evidence to show how long this had been the case. Such evidence would have been useful, especially considering Udelhoven's testimony that he took a distribution beyond his $4,000 monthly salary only once in 11 years.

Moreover, Catalyst was generating significant income based on numerous executory contracts which included, as Plaintiffs acknowledge, at least 20 contracts listed on the schedules. The Chapter 7 Trustee would have been able to determine whether to complete the contracts and generate income for distribution to creditors. Catalyst was an operating business with cash flow between $100,000 and $200,000 every month. According to Udelhoven, 2018 was "almost a record year with new business" and the company was "doing quite well with projects closing out."

18

So, while Catalyst was undercapitalized at the time it filed its petition, it is difficult to say that this factor weighs in favor of piercing the corporate veil.

### c. Udelhoven did not commingle funds with Catalyst's funds, nor did he treat Catalyst's assets as his own

Plaintiffs urge the court to find that these third and fourth factors weigh in favor of piercing the corporate veil. They took testimony from Udelhoven regarding numerous line items in Catalyst's bank statements that were allegedly personal expenses.

The court found Udelhoven to be a credible witness. For the most part he was forthright and did not appear evasive. His explanations of some of the selected expenses – that he purchased music, video games, movies and Gatorade for his employees – are plausible, even if Catalyst was working out of a warehouse at the time.

Other explanations were less believable. It would have served Udelhoven better to admit that a haircut and a veterinary expense were mistakenly charged to his business account rather than a personal credit card. It is difficult to believe that a purchase on December 24 from Atlas Obscura, which sells itself as having "141 Cool, Hidden, and Unusual Things to Do in Chicago, Illinois" was a business expense.

But most of the transactions reviewed by the court – which was many of the thousands included in Plaintiffs' Exhibit G – were clearly expenses related to the operation of Catalyst Construction. The court found no line items that suggested Udelhoven was using Catalyst's bank account as his personal piggy bank – no supermarkets or clothing stores, and few restaurants. Page after page of the account records contains multiple purchases at The Home Depot and Menards. Nearly daily purchases were made at gas stations. There are occasional purchases at other real estate or construction companies including Houzz, Virginia Tile, lumber providers and Groot (waste management services).

Considering Udelhoven's generally appropriate use of Catalyst's funds and assets, this factor does not weigh in favor of piercing the corporate veil.

### 2. Treating Catalyst separately from Udelhoven would not sanction a fraud or promote injustice

The second prong of the veil piercing question asks whether observing the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice. "Once the first element of the test is established, *either* the sanctioning of a fraud (intentional wrongdoing) *or* the promotion of injustice, will satisfy the second element." *Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751, 774 (7th Cir. 2013) (quotation omitted, emphasis in original), *rev'd on other grounds*, 135 S. Ct. 1932 (2015). Even though Plaintiffs established only that Catalyst was undercapitalized at the time it filed for relief under the Bankruptcy Code, the court will consider this prong.

Plaintiffs argue that "Udelhoven's flagrant misappropriation of Plaintiffs' funds is precisely the unfair enrichment that veil piercing is designed to cure. This becomes alarmingly apparent when one reviews Udelhoven's personal expense purchases side by side with his demands for additional payments by Plaintiffs." (Plaintiffs' Posttrial Brief, p. 12).

Plaintiffs point out that shortly before Catalyst received their initial deposit of $42,937, he charged several items relating to a trip to the Wisconsin Dells. Catalyst's bank statements show that Catalyst's deposits that same month totaled over $175,000. In comparison, there are eight charges relating to the Wisconsin trip, totaling approximately $827. Whether or not the court accepts Udelhoven's explanation that visiting Wisconsin was a business expense because of his relationship with Kohler or a comp to a client, it is unlikely that Udelhoven demanded Plaintiffs' deposit so that he could make this trip.

None of the other expenses strike the court as "flagrant misappropriation" of the sort that would promote fraud and injustice if the corporate veil were not pierced. For example, around the same time that Plaintiffs paid $21,468 for the start of demolition – the same month in which Catalyst deposited over $243,000 in its bank account – Udelhoven charged $55 at the Brookfield Zoo, $26 at a barbershop, and approximately $600 at restaurants in Washington, D.C. Udelhoven did not use Catalyst's account for transportation or lodging charges, so it is unclear whether the Washington, D.C. spending was business-related. Plaintiffs did not ask Udelhoven at trial about the Washington, D.C. trip, and there is no mention of it in his deposition transcript. But the comparison of these relatively modest charges to the amount of money deposited in Catalyst's account in August suggests no nefarious purpose when Udelhoven requested that Manny and Lennox pay the next 10% installment due on the contract.

Certainly, there are instances in which Udelhoven's use of Catalyst's credit card appears to have crossed the line into personal expenses. These examples, however, do not rise to the level at which ignoring them would sanction a fraud or promote injustice. The court is mindful that piercing the corporate veil is not favored. Courts are generally reluctant to grant this relief, especially in contract cases involving creditors who voluntarily and knowingly entered into an agreement with a limited liability entity.

For all the reasons stated above, the court declines to pierce the corporate veil. Udelhoven is not liable for Catalyst's debts.

**B. Dischargeability Under 11 U.S.C. § 523**

Even if Manny and Lennox could pierce the corporate veil and hold Udelhoven liable for Catalyst's debts, that alone is not sufficient to prevail on a complaint seeking relief under 11 U.S.C. § 523. Manny and Lennox must prove by a preponderance of the evidence that their debt

should be excepted from Udelhoven's discharge.  *Grogan v. Garner*, 498 U.S. 279, 286-87

(1991).  Exceptions to discharge are construed narrowly in favor of the debtor.  *In re Chambers*,

348 F.3d 650, 654 (7th Cir. 2003) (citation omitted).

While there is no question that Catalyst breached its contract with Manny and Lennox,

Plaintiffs must prove more than a breach.  They seek relief under 11 U.S.C. §§ 523(a)(2), (a)(4)

and (a)(6), and the court will consider each of these subsections in turn.

**1. Even if the corporate veil were pierced, the debt to Manny and Lennox is dischargeable under 11 U.S.C. § 523(a)(2)**

Count I is brought under 11 U.S.C. § 523(a)(2)(A):

**(a)**      A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

**(2)**      for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

To except their claim from discharge based on this subsection, Manny and Lennox must

prove by a preponderance of the evidence that: "(1) the debtor made a false representation or

omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and

(b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v.

Goldberg,* 599 F.3d 712, 717 (7th Cir. 2010) (citations omitted).  When the debtor is a

contractor, the plaintiff has two options for satisfying the requirements of § 523(a)(2)(A): "[B]y

showing that the contractor executed the contract never intending to comply with its terms, or by

demonstrating that he intentionally misrepresented his qualifications when soliciting the work."

*Sullivan v. Ratz*, 551 B.R. 338, 346 (N.D. Ill. 2016) (quotation omitted).

Plaintiffs did not argue that Udelhoven intentionally misrepresented his qualifications. He has a degree in construction management and had operated Catalyst Construction for 10 years when Manny and Lennox hired him.

The question, therefore, is whether Udelhoven executed the contract never intending to comply with its terms. "Nondischargeability cannot be based on a mere failure to keep a promise, such as a mere contractual breach." *Richeson v. Saltzman*, 1997 WL 539660, at *7 (N.D. Ill. Aug. 22, 1997) (citations omitted), *aff'd*, 142 F.3d 440 (7th Cir. 1998). *See Rezin v. Barr*, 194 B.R. 1009, 1018 (Bankr. N.D. Ill. 1996) ("There is quite a difference between a misrepresentation of prior fact and a promise for future performance which is not performed. The former may come under § 523(a)(2)(A), the latter ordinarily may not."). Failure to keep a promise does not mean that the promise was fraudulent. Instead, the issue is whether Udelhoven never intended to follow through and complete the construction.

Plaintiffs assert that Udelhoven requested payments "while repeatedly making false promises of progress on the 1413 Belle Project," and that these false promises were misrepresentations under § 523(a)(2)(A). (Plaintiffs' Posttrial Brief, p. 2). Certainly, Udelhoven promised to continue working on 1413 Belle. But Plaintiffs introduced no evidence to support a finding that Udelhoven *made those promises but never intended to keep them*.

Intent is measured by the debtor's subjective intention at the time of the action. *See Rae v. Scarpello*, 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002). Direct proof of fraudulent intent is often unavailable, so it "may be determined from the totality of the circumstances of a case and may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part." *Central Credit Union of Illinois v. Logan*, 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005) (quotation omitted).

These facts and circumstances do not paint a picture of deceptive conduct.  The fact that

Udelhoven did not complete the project at 1413 Belle is not evidence that he never intended to

do so.  Udelhoven may not have been as responsive as Plaintiffs would have liked, and his

supervision of the project managers could have been more robust, but the totality of the

circumstances do not suggest that he executed the contract for 1413 Belle never intending to

comply with its terms.

Manny felt that the project was "moving along" in August and early September; this

activity shortly after the contract was signed suggests that Udelhoven was following through on

his obligations and intended to do so when he signed the contract.  Udelhoven met with Manny

around October 1, 2018, to discuss the need for LVLs to support the open plan layout.  In early

December, Manny and Udelhoven discussed the need to replace project manager Mike Eviston,

and Udelhoven did so.  In late December or early January, when a decision was made to pull

permits for the project after hiring Widler Architects, Manny spoke with Udelhoven at that time

and again in January.

Plaintiffs assert that "[e]ach time Debtor asked for payment of another phase, he made a

false representation to Plaintiff[s] about the progress of 1413 Belle."  (Plaintiffs' Posttrial Brief,

p. 4).  However, the contract provided for payments at the *start* of a particular phase of

construction.  Plaintiffs paid a 20% deposit upon signing, 10% for the start of demolition, 10%

for the start of framing and 10% for the start of electrical.  There is no question that Plaintiffs

signed the contract, and that demolition began.  Manny testified that Catalyst had "done some

minor framing," and Eviston believed framing was about 30% complete when he left the project.

Eviston also testified that demolition of existing electrical and plumbing had taken place, and the

court heard no evidence regarding whether demolition was considered the beginning of a phase

of construction.  Even if it was not, the only supposedly false representation was that electrical

work was about to start.  For that false representation to support a claim for nondischargeability,

Udelhoven must have intended not to follow through.  As discussed above, the facts and

circumstances do not support a finding of that intent.

Moreover, the court finds no reason "to question why Udelhoven was the one to demand

the installment payments from Plaintiffs if he was not the one controlling the schedule."

(Plaintiffs' Posttrial Brief, p. 6).  Udelhoven testified that he delegated control to his employees

and empowered them to make their own decisions.  Since Catalyst had 20 contracts in various

stages of completion at the time it filed for bankruptcy protection, this makes sense.  It also

makes sense that the one person at Catalyst who had the most to gain or lose from customer

payments would want to be sure those payments were made timely.

Plaintiffs also argue that Udelhoven's representation that they had to pay up front for the

finished goods they ordered, otherwise the vendors would not deliver the goods, was a false

representation.  First, there is no evidence to suggest that this representation was false.  Plaintiffs

did not call any of the vendors as witnesses to testify that in fact they would have delivered the

finished goods without payment in full.  Also, the evidence before the court establishes that

Udelhoven was not involved in ordering finished goods; he relied on Elachowicz to get that done

and to let him know when the goods were ready.  Indeed, Udelhoven testified that he believed

the finished goods Manny and Lennox selected had been ordered from the vendors.  He even

recalled that Elachowicz had "done research and actually found a better price at a different

distributor" on certain items.  Finally, as with the installment payments, the court finds no

nefarious purpose behind Udelhoven requesting payment from his customers while delegating

other aspects of the business to his subordinates.

25

Plaintiffs highlight the loans Catalyst took out with six different creditors, arguing that these are evidence of "the steps Debtor took to exploit the last bit of Catalyst's credit for personal gain." (Plaintiffs' Posttrial Brief, p. 5). The evidence suggests, however, that only two of these claims (Kabbage, Legend Advance Funding) were incurred in the last few months before Catalyst filed for relief under the Bankruptcy Code. Two of the creditors, SomerCor and FC Marketplace, LLC, attached documents to their proofs of claim showing that their debts were incurred in the first half of 2016 – nearly three years before Catalyst filed its bankruptcy case. Even if Catalyst borrowed more as it approached bankruptcy, such borrowing is not evidence that Udelhoven was taking advantage of Catalyst's credit to enhance his own bottom line. More likely it is evidence that Udelhoven was doing everything possible to keep his 10-year-old company in business.

Plaintiffs also point out that approximately 20 customers were listed on Catalyst's Schedule G with existing construction contracts, concluding that "it becomes readily apparent that Debtor was using payments from current clients to pay its surmounting [sic] debts on previous obligations." (Plaintiffs' Posttrial Brief, p. 6). How this is readily apparent is not explained. It is true that Udelhoven used the same installment structure for all his residential clients unless a lender was involved. But the court has no information regarding how many of those clients had begun making payments, how many payments they had made, or whether any of those contracts involved lender funding.

Moreover, even if Udelhoven was using that income to pay other Catalyst debts, that has no relevance to any of the elements required to determine whether *Plaintiffs' claim* is dischargeable under § 523(a)(2)(A). Finally, there is no evidence that any of the funds received

on any of the construction contracts were held in trust, to be used only for the project on which the payment was made.

Plaintiffs conclude this section of their brief by arguing that Udelhoven "did not have a justifiable reason for requesting these payments given the state the 1413 Belle Project was in." (Plaintiffs' Posttrial Brief, p. 6). They appear to be referring to the third element of a § 523(a)(2)(A) claim, that the creditor "justifiably relied" on the debtor's statement. *See Field v. Mans*, 516 U.S. 59, 74-5 (1995).

In fact, the evidence suggests that Manny and Lennox were *not* justified in relying on Udelhoven's statements. Manny works in commercial real estate and has done so for the past 10 years. He is an asset manager for a commercial real estate firm and reviewed around a hundred construction contracts in that capacity.

Manny also testified that because their short-term lease was close to 1413 Belle, he visited the project frequently, up to several times every week. The evidence does not support a finding that Manny was justified in relying on Udelhoven's statements when he could and frequently did see, from an experienced point of view, what progress was being made at 1413 Belle.

As was the case with the debtor-contractor in *Sullivan v. Ratz*, Udelhoven's "record-keeping and project management skills certainly left something to be desired, but there is evidence in the record that he purchased supplies, lined up workers, and actually performed some work." 551 B.R. at 350. Manny and Lennox did not prove by a preponderance of the evidence that Udelhoven promised to complete the project at 1413 Belle with no intention of following through. They have not stated a claim under § 523(a)(2)(A).

**2. Even if the corporate veil were pierced, the debt to Manny and Lennox is dischargeable under § 523(a)(4)**

Counts II and III are brought under 11 U.S.C. § 523(a)(4), which provides:

> **(a)** A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-- ….

>> **(4)** for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny….

In both their pretrial and posttrial briefs, Plaintiffs' only reference to § 523(a)(4) is to provide the definition of embezzlement under federal common law: "Embezzlement is the fraudulent or knowing and willful misapplication or conversion of property that belongs to another person by one to whom such property has been entrusted or into whose hands it has lawfully come." *In re Jaffe*, 111 B.R. 701, 702 (Bankr. N.D. Ill. 1990) (citation and footnote omitted); *see Matter of Weber*, 892 F.2d 534, 538 (7th Cir. 1989), *abrogated on other grounds by Grogan v. Garner*, 498 U.S. 279 (1991).[2] Manny and Lennox argue that they paid about 88% of the contract price, yet construction never progressed past the demolition phase. The argument

---

[2] There is no discussion in either brief, as there was in the Joint Pretrial Statement, of Udelhoven owing Manny and Lennox a fiduciary duty because he knew or should have known that Catalyst was insolvent. Therefore, the court assumes Plaintiffs abandoned this argument.

Even if Plaintiffs did not abandon it, they would not prevail. Assuming for purposes of this discussion that Catalyst was insolvent as it approached bankruptcy, and even if Udelhoven as Catalyst's single member owed a fiduciary duty to creditors under state law, that fiduciary duty is not sufficient to establish a fiduciary relationship under § 523(a)(4). *In re Berman*, 629 F.3d 761 (7th Cir. 2011), *abrogated on other grounds by Bullock v. BankChampaign*, 569 U.S. 267 (2013).

A creditor filed an adversary proceeding in *Berman*, arguing that an officer/director's fiduciary duty to creditors when a corporation becomes insolvent "amounts to a fiduciary duty for purposes of federal bankruptcy law under section 523(a)(4)." *Id.* at 766. The Circuit rejected this argument:

> We hold that even if the evidence showed that Berman & Associates was insolvent when all or some part of the debt arose, so that Berman would have had a fiduciary duty toward creditors under Illinois law, this state law duty would not have constituted a basis for non-dischargeability of the debt owed to Follett under section 523(a)(4).

*Id.* at 767. Pursuant to this binding precedent from the Seventh Circuit, any state law expansion of Udelhoven's fiduciary duty to Catalyst's creditors is insufficient to establish the fiduciary relationship required for liability under § 523(a)(4).

then transforms back into one about false representations.  (Plaintiffs' Posttrial Brief, p. 4).  This argument was already – and more appropriately – discussed in the section of the opinion resolving the claim for relief under § 523(a)(2).

To prove that Udelhoven embezzled from them, Manny and Lennox must prove by a preponderance of the evidence "that: (1) the debtor appropriated funds or property for his or her own benefit; and (2) the debtor did so with fraudulent intent or deceit.  For purposes of embezzlement, fraudulent intent is knowledge that the use is devoid of authorization."  *In re Arvanitis*, 2015 WL 5202990, at *17 (Bankr. N.D. Ill. Sept. 1, 2015) (citations and quotation omitted).

An instructive case on the application of § 523(a)(4) to a construction project is *In re Mathis*, 360 B.R. 662 (Bankr. C.D. Ill. 2006).  Debtor/defendant Darrel Mathis entered into an $186,477 contract to build a house for Jerry Cripe and Nancy Lewis.  Cripe and Lewis took out a construction loan.  The parties contemplated that Mathis would submit draw requests on the loan, describing the entities who provided materials and labor and how much was owed.  After disputes arose regarding Mathis's workmanship and the project going over budget, Cripe took over the project.  $225,000 was put into the house while Mathis was involved, but construction was not finished at the time of trial.

Cripe and Lewis sued Mathis in state court and obtained a judgment.  They then brought a complaint seeking to except that judgment from Mathis's discharge under §§ 523(a)(2) and (a)(4).  Judge Gorman rejected both claims.  As she explained:

> In this case, the Plaintiffs have not proven embezzlement. Mr. Mathis had a right to payments under the contract once certain stages of the project were reached. The Plaintiffs did not retain a property interest in the money Mr. Mathis received from them. The money was deposited in an account at Town & County Bank owned by Mr. Mathis. It was not a trust or escrow account. *One cannot embezzle one's own property.* Thus, when Mr. Mathis used the funds to pay himself for

> work performed on the project, even if the amount due to him was in dispute, he
> was not embezzling.

*Id.* at 668 (quotation omitted) (emphasis added).

The same reasoning applies in this case. Plaintiffs had a contract with Catalyst (and for the purposes of this discussion, the court assumes that Udelhoven stands in Catalyst's shoes as its alter ego). Pursuant to the terms of this contract, Manny and Lennox gave money to Udelhoven and he promised to remodel their property. The terms of the contract provided that payments would be made upon signing as well as when different phases of the project began. There was no contract term, however, that required the funds to be used only for the labor and materials needed for that phase.

Under § 523(a)(4), it does not matter that Udelhoven completed none of those phases, or that usually demolition is complete before other phases of construction begin. The procedures set forth in the contract were followed. Udelhoven could not embezzle money that belonged to him.

Neither did Udelhoven embezzle the money Plaintiffs paid for the finished goods ordered from third-party vendors. There may have been a verbal understanding, but "under the contract, there was no requirement that [Udelhoven] segregate the money received from [Manny and Lennox], nor was there a requirement that the funds be used exclusively for their home." *In re Bren*, 284 B.R. 681, 698 (Bankr. D. Minn. 2002).

The contract stated that after "design selections are finalized an addendum may be made to facilitate Catalyst managing the procurement of the materials through our standard process." The parties entered into an addendum under which Catalyst agreed to be responsible for procurement, storage and delivery of those materials. Udelhoven believed that the materials had been ordered.

> The trigger for the second payment is actually when I received an email from my
> general manager saying that the cabinets were in at the cabinet supplier.  And….
> all that plumbing product was on order from the supplier…. [A]s far as
> personally checking on it, you know, that wasn't – that wasn't what I was doing at
> that point….  I did not know if it was paid for, no.

At both his deposition and at trial, Udelhoven explained that he relied heavily on general

manager Mark Elachowicz to manage the payments made to vendors.

Embezzlement requires fraudulent intent or deceit.  Udelhoven may have been

disorganized, or a poor supervisor, or both. *See., e.g., Korrub v. Cohn*, 561 B.R. 476, 488 (Bankr.

N.D. Ill. 2016) ("[T]he court finds it far more likely that Cohn was so disorganized and

incompetent that he put together an unrealistic budget at the outset of the project.").  But having

observed Udelhoven's demeanor on the witness stand, and finding him forthright and credible,

the court determines that there is no evidence of fraudulent intent or deceit.

Therefore, Plaintiffs failed to prove by a preponderance of the evidence that Udelhoven's

debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

### 3. Even if the corporate veil were pierced, the debt to Manny and Lennox is dischargeable under § 523(a)(6)

Count IV is brought under 11 U.S.C. § 523(a)(6), which provides:

> (a) A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of
> this title does not discharge an individual debtor from any debt-- ….
>
>> (6) for willful and malicious injury by the debtor to another entity or to the
>> property of another entity;

Although Manny and Lennox pleaded a count under § 523(a)(6) and described the basis for the

claim in the Joint Pretrial Statement as the removal of a heat source from 1413 Belle in the

middle of the winter, their pretrial and posttrial briefs make no argument under this subsection of

the Code.

The only evidence the court heard that could support this count was Manny's testimony that "the property was left sort of in an abandoned state with no heat."  The parties also stipulated that Catalyst removed a temporary heater in February 2019.  When questioned about this at trial, Udelhoven stated that he did not know who removed the heater.

"[O]nly acts done with the actual intent to cause injury" come within the scope of § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). Our Circuit later specified "that a willful and malicious injury, precluding discharge in bankruptcy of the debt created by the injury, is one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *Jendusa–Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012).

If Plaintiffs intended to proceed with their § 523(a)(6) count, they would have had to prove by a preponderance of the evidence that Udelhoven injured their property knowing that he had no legal justification to do so, and that he either intended to inflict that injury or knew it was highly likely to result from his act.  However, Udelhoven testified that he did not know who removed the heater.  Also, the court heard no evidence regarding the amount and scope of injury to Plaintiffs' property from removal of the heater by this unknown person.

Therefore, Plaintiffs failed to prove by a preponderance of the evidence that Udelhoven's debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

### C.  Denial of Discharge Under 11 U.S.C. § 727.

Separate and apart from the question of whether the corporate veil should be pierced, or whether their debt is nondischargeable, Manny and Lennox seek denial of Udelhoven's discharge under 11 U.S.C. §§ 727(a)(3) and (a)(4).

Objections to discharge are construed strictly against the objecting creditor and liberally in favor of the debtor.  *See In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002), *aff'd, Kontrick v. Ryan*, 540 U.S. 443 (2004).  According to the Federal Rules of Bankruptcy Procedure, "[a]t the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection." Fed. R. Bankr. P. 4005.  The objecting creditor must establish grounds for denial of discharge by a preponderance of the evidence.  *In re Scott*, 172 F.3d 959, 966–67 (7th Cir. 1999).  Denial of discharge is a drastic remedy reserved only for the worst actors.  *See, e.g., Stathopoulos v. Bostrom*, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002), *aff'd*, 2003 WL 403138 (N.D. Ill. Feb. 20, 2003).

**1.  Udelhoven's discharge will not be denied under § 727(a)(3)**

Pursuant to § 727(a)(3):

(a)  The court shall grant the debtor a discharge, unless - . . .

> (3)      the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

A creditor need not prove that the debtor intended to defraud it by failing to keep or destroying books and records. "Section 727(a)(3) does not require proof of criminal or quasi-criminal conduct."  *Scott*, 172 F.3d at 969.

While the Seventh Circuit has instructed lower courts that the language of § 727(a)(3) "places an affirmative duty on the debtor to create books and records accurately documenting his business affairs," *id.* (citation omitted), it gave that instruction in the context of a complicated Chapter 11.  In contrast, "most bankruptcies are consumer-type bankruptcies with no assets or business affairs to speak of, and, therefore, the complexity of their business transactions do not implicate § 727(a)(3)." *Id.* at 970.

In their posttrial brief, Manny and Lennox devote three short paragraphs to this claim for relief. They begin and end this section by stating that Udelhoven maintained inadequate records, repeating the standard that he "failed to provide enough information to ascertain his financial condition and track his financial dealings with substantial completeness and accuracy." (Plaintiffs' Posttrial Brief, p. 8). But between those beginning and ending statements, Plaintiffs provide only a discussion of the law. They make no application of the law to the facts of this case, citing no testimony from witnesses and failing to direct the court to any exhibits. Nor do Plaintiffs specify exactly how Udelhoven's books, documents, records and papers are deficient.

The court concludes that this is because Plaintiffs introduced no evidence, neither testamentary nor documentary, about Udelhoven's personal financial situation. The bank statements and checks introduced at Exhibits G-1, G-2 and G-3 were held in the name of Catalyst Construction and Remodeling, not Eric Udelhoven. This is not helpful, because the court is not considering whether Catalyst's discharge should be denied under § 727(a)(3). Limited liability companies are not entitled to a discharge. 11 U.S.C. § 727(a)(1). How can the court determine whether Udelhoven maintained books and records that accurately documented his financial affairs when no evidence of his personal financial record-keeping was submitted?

Additionally, Udelhoven's bankruptcy case docket shows no indication that his Chapter 7 Trustee sought additional books and records or had any issue with the documents Udelhoven submitted to him. The Trustee filed no requests for authority to conduct an examination under Fed. R. Bankr. P. 2004, no motions to extend the deadline for objecting to discharge and no motions to compel turnover. He conducted the meeting of creditors under 11 U.S.C. § 341, continued the meeting several times, and eventually filed a no asset report. As described in Defendant's Exhibit 12, hundreds of pages of financial records were provided to the Plaintiffs

and to the Catalyst case trustee, but none of the records pertaining to Udelhoven individually

were submitted to the court.

Therefore, the court finds that Plaintiffs have not met their burden of proof under §

727(a)(3).  Judgment will be entered for Udelhoven on this count.

**2.  Udelhoven's discharge will not be denied under § 727(a)(4)[3]**

Pursuant to 11 U.S.C. § 727(a)(4):

(a)  The court shall grant the debtor a discharge, unless - . . .

    (4)    the debtor knowingly and fraudulently, in or in connection with
the case—

        (A) made a false oath or account;

        (B) presented or used a false claim;

        (C) gave, offered, received, or attempted to obtain money,
property, or advantage, or a promise of money, property, or
advantage, for acting or forbearing to act; or

        (D) withheld from an officer of the estate entitled to possession
under this title, any recorded information, including books,
documents, records, and papers, relating to the debtor's
property or financial affairs.

---

[3] Count VI of Plaintiffs' complaint alleges a claim under 11 U.S.C. § 727(a)(4), although Plaintiffs did not cite a specific subsection.  In the complaint, Plaintiffs appear to request relief pursuant to subsection (a)(4)(B), under which a discharge shall not be granted if "the debtor knowingly and fraudulently, in or in connection with the case -- . . . (B) presented or used a false claim."

Plaintiffs' pretrial and posttrial briefs, as well as the Joint Pretrial Statement, do not pursue a remedy under § 727(a)(4)(B).  Even if they did, all the false claims alleged in Count VI relate to representations made months before Udelhoven filed for relief under the Bankruptcy Code, and therefore were not made "in or in connection with the case."

The briefs and the Joint Pretrial Statement argue that relief is appropriate under §§ 727(a)(4)(A) and (a)(4)(C), and so the court will address these arguments.

a.  **11 U.S.C. § 727(a)(4)(A) - Plaintiffs did not prove by a preponderance of the evidence that Udelhoven made a false oath or account, knowingly and fraudulently, in or in connection with the case**

In order "to prevail on a claim under [§ 727(a)(4)(A)], the [plaintiff] must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Stamat v. Neary*, 635 F.3d 974, 978-79 (7th Cir. 2011) (string citations omitted).

"A debtor's petition, schedules, statement of financial affairs, statements made at an 11 U.S.C. § 341 meeting, and answers to interrogatories all constitute statements under oath for purposes of § 727(a)(4)." *Fiala v. Lindemann*, 375 B.R. 450, 469 (Bankr. N.D. Ill. 2007) (citations omitted).

Manny and Lennox argue that Udelhoven's failure to list them as creditors on both his petition as well as on the Catalyst petition were false oaths.  These omissions are the basis of their claim that Udelhoven's discharge should be denied under § 727(a)(4)(A).

First, any statements made in or in connection with *Catalyst's* bankruptcy case are irrelevant to the question of whether *Udelhoven's* discharge should be denied.  Plaintiffs included only Catalyst's bankruptcy schedules on their exhibit list, not Udelhoven's.  An individual's discharge may be denied under § 727(a)(4)(A) for certain actions in or in connection with *his or her case*.  This adversary proceeding was filed in Udelhoven's bankruptcy case, and it is to his schedules and Statement of Financial Affairs that the court must look.  Although neither party included those papers on their list of exhibits, they are on the docket and the court can take judicial notice of them.

Second, Manny and Lennox had a contract with Catalyst.  Grant Manny is listed on Catalyst's Schedule G, which asks the debtor to list all executory contracts.  He was not omitted

from Catalyst's bankruptcy schedules.  Since Manny and Lennox's contract was with Catalyst,

and they were listed in Catalyst's Schedule G, they were appropriately omitted from

Udelhoven's schedules.

Even if the corporate veil were pierced, Manny and Lennox's omission from

Udelhoven's Schedule F would satisfy only three of the five elements of § 727(a)(4)(A): a false

statement, made under oath, that related materially to the bankruptcy case.  There is no evidence,

however, that Udelhoven knew omitting Manny and Lennox from his own schedules was a false

statement, or that he did so with fraudulent intent.

"Intent to defraud involves a material representation that you know to be false, or, what

amounts to the same thing, an omission that you know will create an erroneous impression." *In*

*re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998).  A reckless disregard for the truth, established by

showing that the debtor made numerous false statements or omissions, is sufficient to prove

fraudulent intent.  *Stamat*, 635 F.3d at 982.  *See In re Duncan*, 562 F.3d 688, 695 (5th Cir. 2009)

(citation omitted) ("[T]he cumulative effect of false statements may, when taken together,

evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent.").

Two points suggest that Udelhoven lacked intent to defraud.  First, he amended his

schedules to add Manny about a month after the petition date.  "Although subsequent voluntary

disclosure through testimony or an amendment to the schedules cannot expunge the falsity of an

oath, subsequent disclosures are evidence of innocent intent." *In re Garcia*, 586 B.R. 909, 919

(Bankr. N.D. Ill. 2018) (quotation omitted).  This is especially so when the amendment is done

quickly, as it was here, and before the meeting of creditors.  Udelhoven's timely amendment

gave the case trustee and creditors in attendance at the meeting the opportunity to ask questions

and inquire further.

Second, while Plaintiffs argue that Udelhoven's "whole pattern of conduct underscores [his] reckless disregard [for the truth], seeing as Udelhoven was in direct communication with the Mannys as late as January of 2019 – less than a month before his filing for bankruptcy," (Plaintiffs' Posttrial Brief, p. 15), the pattern courts look for is in the number of false oaths made in connection with the bankruptcy case.  The "pattern of conduct" to which Plaintiffs refer did not consist of statements made in connection with the bankruptcy case, nor were these statements made under oath.

Plaintiffs have not proven by a preponderance of the evidence that Udelhoven's discharge should be denied under § 727(a)(4)(A).

**b.    11 U.S.C. § 727(a)(4)(C) - Plaintiffs did not prove by a preponderance of the evidence that Udelhoven gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act**

Finally, Plaintiffs argue that because Udelhoven took money from them even as he knew or should have known that Catalyst was not financially viable, he knowingly and fraudulently received money and his discharge should be denied under § 727(a)(4)(C).

In neither their pretrial nor their posttrial briefs did Plaintiffs state the standard for denial of discharge under this section or cite any law or precedent in support of their claim.  The statute instructs courts to deny a debtor's discharge if he received money "for acting or forbearing to act."  To what action or forbearance are Plaintiffs referring?  And how was this act or forbearance in or in connection with the case?

As Judge Squires explained in *Lindemann*, "[t]his section addresses any attempted or actual extortion or bribery in connection with a bankruptcy case."  375 B.R. at 471 (citation omitted).  *See In re Verbeek*, 2018 WL 4907840, *5 (Bankr. N.D. Ohio Oct. 9, 2018) ("The purpose of § 727(a)(4)(C) is to punish the efforts of a debtor to subvert the bankruptcy process

itself, as differentiated from the seeking of an advantage with respect to a particular claim.")

(quotation omitted).

The complaint and interrogatories in *Lindemann* did "not set forth any specific

allegations or explain how the Debtor engaged in extortion or bribery." *Lindemann*, 375 B.R. at

471. The same is true in this case. Plaintiffs submitted no evidence in support of a claim that

Udelhoven extorted or bribed anyone, or even attempted to do so.

Plaintiffs have not proven by a preponderance of the evidence that Udelhoven's discharge

should be denied under § 727(a)(4)(C).

## IV.    CONCLUSION

For all of the foregoing reasons, the court finds that Manny and Lennox have a claim

against Catalyst, not against Udelhoven, and that the corporate veil should not be pierced. Even

if Udelhoven were liable to Manny and Lennox, their claim would not be excepted from

discharge under 11 U.S.C. § 523. Finally, Udelhoven's discharge will not be denied under 11

U.S.C. § 727.

The court will enter judgment for the Defendant in accordance with these findings.

Date:   January 14, 2021          _____

                                  DAVID D. CLEARY
                                  United States Bankruptcy Judge